607 So.2d 699 (1992)
Robert F. AZAR, M.D.
v.
Cecil M. SHILSTONE, Jr.
No. 91-CA-2095.
Court of Appeal of Louisiana, Fourth Circuit.
October 15, 1992.
Robert A. Kutcher, Nicole S. Tygier, Bronfin, Heller, Steinberg & Berins, New Orleans, for defendants/appellees.
David R. McDaniel, Metairie, for plaintiff/appellant.
Before SCHOTT, C.J., and JONES and LANDRIEU, JJ.
JONES, Judge.
Plaintiff, Robert F. Azar, M.D., appeals the trial court's judgment dismissing his demand for payment on a promissory note. We affirm the trial court's judgment.
John P. "Paul" Richardson approached defendant, Cecil M. "Mackie" Shilstone, and plaintiff, Robert F. Azar, M.D. about purchasing or joining him as partners in a publishing concern. Initially, Richardson and Shilstone entered into an agreement whereby they formed SEM Publishing Company, Inc. Not long after the creation of this company, the opportunity to acquire the NEW ORLEANS MAGAZINE was presented to the principals. Unable to finance the acquisition, Shilstone approached his employer, Dr. Azar, who was also his close personal friend and mentor. Dr. Azar lent his creditworthiness and financial backing to the company in exchange for a one-third interest. Unbeknownst and undisclosed to Richardson, Shilstone transferred *700 his one-third interest to Dr. Azar for $4,000.00; leaving Dr. Azar and Richardson as the only shareholders for the company.
On account of Dr. Azar's financial standing, Colonial Bank arranged a loan and a letter of credit for SEM. Dr. Azar, Richardson and Shilstone each signed continuing guaranties for the extension of credit. The company then purchased NEW ORLEANS MAGAZINE, including its trademark and copyrights, for $300,000.00.
Initially, SEM was profitable. During that period, it was decided that it would be better if SEM owed Dr. Azar rather than Colonial Bank. Dr. Azar's personal check for $238,535.00 was deposited in SEM's checking account and SEM paid its indebtedness to Colonial Bank in full. A promissory note was executed by Richardson and Shilstone personally indorsing and guaranteeing the loan by Dr. Azar to SEM. As time passed Shilstone gradually withdrew from the daily operations of SEM and, consequently, Dr. Azar became more involved. SEM began to lose money in its operations. Richardson and Shilstone made direct cash loans to SEM although the formalities were not observed as they had been with the promissory note at issue. Dr. Azar also contributed large amounts of money to SEM without observing any formalities.
Dr. Azar received no repayment from SEM on the promissory note. He began to actively seek the sale of NEW ORLEANS MAGAZINE. Neither Richardson or Shilstone could locate a buyer or investor that would agree to terms that would net enough cash to fully repay Dr. Azar and satisfy any personal obligations to third parties arising from the publication of the magazine as Dr. Azar had instructed. Dr. Azar unilaterally re-entered negotiations with an interested party, Metcalf, to sell the magazine. An agreement was reached but Dr. Azar never informed Richardson of the terms of the sale. On July 24, 1987 Richardson signed a "Sale of Stock" document transferring ownership of his shares in SEM to Dr. Azar in return for Dr. Azar releasing, indemnifying and holding him harmless from liability on the promissory note. The document was never signed by Dr. Azar.
The agreement made by Dr. Azar and Metcalf for their respective corporations required the payment by Metcalf's company (NEW ORLEANS MAGAZINE, INC.) to SEM of a mere $1,270.00 at the closing. The sale contemplated future payments of $165,000.00 to SEM and $150,000.00 to Dr. Azar but Metcalf's company would not be obliged to pay unless the magazine reached certain profit levels. Dr. Azar received, for his promise not to compete, $70,000.00. He also agreed that "any entity controlled by him" was likewise prohibited from competing. The sale also comprehended the assumption of $55,000.00 of debt, which was offset by $183,597 of accounts receivable, of which $70,503.00 appears to be less than 30 days old.
On October 8, 1987 Dr. Azar sued Shilstone on the note. Shilstone filed an answer, a reconventional demand against Dr. Azar, third party demands against SEM and Richardson, and later filed an amended answer with further affirmative defenses. Trial on the merits was held before the Commissioner and Judge ad hoc on December 3rd and 6th, 1990. The Commissioner recommended that: 1) the principal demand of Dr. Azar against Shilstone be dismissed with prejudice; 2) Shilstone's reconventional demands against Dr. Azar be dismissed with prejudice and 3) Shilstone's third-party demands against SEM and Richardson be dismissed with prejudice. The trial court adopted the Commissioner's findings without exception and judgment was rendered accordingly.
On appeal, Dr. Azar argues that the trial court erred 1) in resorting to equitable principles instead of deciding this case pursuant to the commercial laws of Louisiana; 2) in allowing Shilstone to raise the alter ego claim because it is an affirmative defense that was never pleaded; 3) in finding that it was bad faith for Dr. Azar to sue Shilstone and not Richardson on the note; 4) in finding that Shilstone's subrogation rights had been impaired by Dr. Azar; 5) in basing its judgment on incorrect findings of fact and 6) in following the recommendations of the Commissioner, who was biased and prejudiced against him. We find that all of Dr. Azar's assignments of error lack merit and discuss each in turn.
*701 By his first assignment of error, Dr. Azar contends that this case should have been decided pursuant to the commercial laws of Louisiana. He argues that Shilstone failed to establish and prove a defense by preponderance of the evidence. La.R.S. 10:3-307 and comment 2. Dr. Azar points out that the defenses available are set forth in La.R.S. 10:3-601 as well as the general surety and obligation articles of the Louisiana Civil Code. Dr. Azar claims that Shilstone's defenses that there was mismanagement of SEM and that fiduciary duties owed to SEM were breached are claims the corporation itself has against an offending officer or director. Beyer v. F & R Oilfield Contractors, Inc., 407 So.2d 15 (La.App. 3d Cir.1981), writ denied 411 So.2d 451 (La.1982); Bacher v. Albert, 180 La. 108, 156 So. 191 (1934). As a guarantor, Shilstone had no right to the defense.
Shilstone argues that as guarantor of SEM, he would step into the shoes of SEM and acquire the rights of SEM against its mismanaging sole shareholder. La.C.C. article 3048. He argues that Aiavolasiti v. Versailles Gardens land. Dev. Co., 371 So.2d 755, 759-60 (La.1979) is precedent for this case. Shilstone maintains that Dr. Azar was attempting to make himself whole to the detriment of his co-sureties.
We agree with Shilstone that the terms of the sale of NEW ORLEANS MAGAZINE favor Dr. Azar disproportionately. Dr. Azar denies having participated in structuring the sale to benefit him personally, however it is clear that that was the result. It was his testimony that his attorney, David Sherman, and his accountant, J.V. Leclere Krentel, structured the sale for him. Krentel testified to the contrary; that he did not participate in the structuring of the sale and that to the best of his knowledge Dave Sherman and Dr. Azar structured the sale agreement. Mr. Sherman testified that the terms of the sale were dictated by Mr. Metcalf and that Mr. Metcalf refused to negotiate them. Obviously, this became an issue of credibility.
Mr. Sherman and Mr. Krentel worked for Dr. Azar personally and only incidentally performed work for SEM. Mr. Sherman testified that all of his work for SEM was done as an accommodation for Dr. Azar who is one of his biggest clients. Dr. Azar had made it known that he wanted to be made whole and the terms of the sale clearly indicate that he was made as close to whole as the sale price would accommodate. We do not find that it was manifest error for the trial court to conclude that Dr. Azar's fiduciary duty to SEM was breached.
By his second assignment of error, Dr. Azar argues that he was never put on notice that the alter ego claim was an issue. Furthermore, this issue should have been disallowed because Louisiana Code of Civil Procedure requires that the answer set forth all affirmative defenses.
Alternatively, Dr. Azar argues that it was error for the trial court to find that SEM is his alter ego. Although the Commissioner did allow evidence pertaining to the alter ego issue, it does not appear to have been critical to its resolution of this case. For that reason we pretermit discussion of this issue.
By his third assignment of error, Dr. Azar argues that it was not bad faith for him to sue Shilstone alone, although Richardson was also a guarantor, because Richardson had no assets. He argues that his actions were motivated by business sense; that he should reduce his losses. Dr. Azar insists that such actions were reasonable.
Shilstone argues that, at a minimum, the release of Richardson entitles Richardson's solidary co-obligor, Shilstone, to a pro tanto release equal to Richardson's potential liability to Dr. Azar, or his virile share.
The Commissioner concluded that Dr. Azar advantaged himself in grabbing control of SEM but seeks to avoid the disadvantages of such conduct. He fully expected that Shilstone would be required to pay the shortfall and he apparently structured the sale to suit himself. The Commissioner found that this was bad faith.
Although Dr. Azar sued Shilstone alone, it can not be said that Richardson was released from the promissory note. The facts indicate that Richardson signed a document entitled "Sale of Stock" prepared by Mr. Sherman acting on behalf of Dr. Azar. Richardson transferred ownership of his shares in SEM to Dr. Azar for Dr. Azar's *702 agreement to release, indemnify and hold him harmless from any liability connected with SEM. Although Richardson relinquished his stock, Dr. Azar refused to sign the document. He did, however, accept the shares of stock in order to effectuate the sale of NEW ORLEANS MAGAZINE.
Subsequently, Mr. Sherman contacted Mr. St. Pe, the attorney representing Richardson by this time, and explained that Dr. Azar refused to legally release Richardson but had no intention of pursuing payment from Richardson on the note because he had been advised that Richardson was insolvent.
A creditor may elect to pursue one of several solidary obligors which Dr. Azar did in the instant case. Were Shilstone found liable on the note he could still pursue Richardson. However, the issue of bad faith arises based on testimony at trial by Richardson and Shilstone that Dr. Azar gave them both private verbal assurances that he would not pursue them for payment on the note but that each should keep this information confidential. If the Commissioner found such testimony credible, it is clear why he made his finding of bad faith. We cannot say such a finding was manifestly erroneous.
By his fourth assignment of error, Dr. Azar argues that it was error for the trial court to find that he impaired collateral when the loan was unsecured and there was no collateral to impair. Further, he argues that Shilstone's subrogation rights were not violated by him.
Shilstone cites La.C.C. article 3061 (before its repeal), which is applicable to these facts, which states that the surety is discharged when by the act of the creditor, the subrogation to his rights, mortgages and privileges can no longer be operated in favor of the surety. Dr. Azar did not act as the original creditor would have acted; exhausting the assets of the debtor and applying them to reduce the debt.
The Commissioner cited La.C.C. article 3183 which provides:
The property of the debtor is the common pledge of his creditors, and the proceeds of its sale must be distributed among them ratably, unless there exist among the creditors some lawful causes for preference.
The Commissioner stated that article 3062 imposes the burden of proof upon the creditor to show that the surety has not been prejudiced by his act. Dr. Azar sold the property of the debtor, SEM, for $71,270.00. Of that $70,000.00 (or 98.22% of the cash proceeds) was paid directly and personally to Dr. Azar. Dr. Azar failed to prove that Shilstone was not prejudiced by this act.
Some analysis of Shilstone's status and his relationship to SEM is necessary for our discussion of this issue. A distinction exists between accommodation makers and accommodation indorsers, and only an accommodation indorser is allowed to assert suretyship defenses. La.C.C. article 3037. Shilstone was no longer a principal in SEM when Dr. Azar asked him to indorse the promissory note. He received no benefit or consideration for signing the note. We find that he is entitled to assert suretyship defenses despite the fact that article 3037 was not effective at the time the parties entered into the contract. As against the principal, accommodation indorsers have been allowed to assert suretyship defenses. See Aiavolasiti, supra; Michael H. Rubin, "Security Devices" 49 La.L.R. 495, 508 (1988).
Shilstone argues that Dr. Azar, the holder of the note, prejudiced his subrogation rights by his sale of NEW ORLEANS MAGAZINE, SEM's sole source of revenue, thereby releasing him as surety. As the holder of the note Dr. Azar owed a responsibility to the sureties. The way in which the sale took place, including the terms of the sale agreement, are highly suspicious. Neither Richardson, who was also a one-third shareholder, or Shilstone were informed before the sale was confected. Considering the effect that the sale had on their liability on the note, we find that it was incumbent on Dr. Azar to notify them of the pending sale and allow them to participate before selling the assets of SEM.
Shilstone's defense is good against Dr. Azar. By Dr. Azar's acts, impairing Shilstone's right of recourse, Shilstone is discharged *703 from liability on the note. La.R.S. 10:3-601; Sims v. Asian Intern, LTD, 521 So.2d 411 (La.App. 1 Cir.1987) writ denied 523 So.2d 1337 (La.1988).
By his fifth assignment of error, Dr. Azar challenges the Commissioner's findings as not being supported by the record, specifically: (1) He gave no assurance to Shilstone that he would not try to collect on the note; (2) It was not his idea to make the loan to SEM; and (3) there was evidence that the terms of the sale of NEW ORLEANS MAGAZINE were favorable to SEM.
Obviously, the Commissioner made a credibility call when he found that Dr. Azar made assurances to Richardson and Shilstone that no effort would ever be made to collect this debt. The Commissioner focused on the nature of Shilstone's relationship with Dr. Azar and the fact that Shilstone did not have a disinterested legal advisor to conclude that Shilstone was misled and deceived by these assurances.
As for the other two allegedly erroneous findings, the Commissioner made these deductions from his review of the facts. Richardson testified that he was informed by Shilstone that Dr. Azar was going to pay off the note at Colonial Bank. Dr. Azar testified that it was Shilstone's decision that Colonial Bank should be paid off. He stated that because of the nature of their relationship he entrusted Shilstone with arranging for the loan to SEM to come from him rather than Colonial.
Shilstone's testimony was directly opposed to Dr. Azar. His recollection was Mr. Sherman approached him about signing a promissory note for the amount of the loan made to Dr. Azar. Mr. Sherman explained that since Dr. Azar had the control, why should he owe money to the bank when he could owe it to himself. Shilstone's wife testified that on several occasions Mr. Sherman called their home and was anxious for her husband to come to the office to execute the promissory note. Shilstone testified that he signed the note because he assumed Mr. Sherman represented him as well as SEM and Dr. Azar. Mr. Sherman testified that he only represented Dr. Azar in the preparation of the promissory note. We find that the Commissioner made a credibility call when he concluded that it was Dr. Azar's idea to make the loan to SEM and such a finding is not unreasonable.
Finally, the terms of the sale on their face do favor Dr. Azar disproportionately. Such a finding is supported by the record.
By his sixth assignment of error, Dr. Azar argues that the Commissioner was biased and prejudiced against him. Quoting counsel for Dr. Azar, the Commissioner's prejudicial remarks included:
... you asked me if I was aware that Dr. Azar had used up his green stamps around here. I believe that you commented on Dr. Azar's testimony, specifically, and then also said that he doesn't even know where he lives based upon the recent [S]upreme [C]ourt case he was involved in. You advised us that the whole deal stinks.... You made the comment that Azar could afford the loss, and he could buy and sell anyone around here. And you also made it clear that a judge may be able to phrase his opinion along facts and lines as to who he believes and doesn't believe and that may prevent [an appellate] court from overturning a suit. Judge, you also commented that you believe Shilstone got [B_____s_____d] into signing the note that's at issue in this proceeding.
Because the Commissioner's findings were subject to a de novo review by the trial court, which accepted them without exception, and because there are adequate legal reasons for the judgment, separate and apart from the credibility/bad faith issue, we find any prejudice on the part of the Commissioner to be harmless error.
Furthermore, Dr. Azar failed to take advantage of the proper remedy to this situation when he moved for mistrial. He should have moved for recusal. We do not find that Dr. Azar is entitled to a new trial.
For the foregoing reasons, we affirm the trial court's judgment.
AFFIRMED.
SCHOTT, Chief Judge, concurring:
We are favored with extensive and meticulous findings of fact by the trial court *704 which were drafted by a commissioner and adopted by the trial judge. These findings are not manifestly erroneous. In the few instances where appellant takes issue with them he questions credibility calls by the commissioner. This is the function of the trial court and will not be disturbed on appeal.
Several conclusions readily emerge from the trial court's findings:
1. Plaintiff was not a holder in due course with respect to the note he sued on. A holder in due course is one who takes the instrument in good faith. R.S. 10:3-302(1)(b). The findings of the trial court demonstrate plaintiff's lack of good faith in his conduct toward defendant and Richardson both before and after execution of the note.
2. Since plaintiff was not a holder in due course he was subject to the defenses urged by defendant. R.S. 10:3-306. These include plaintiff's discharge of defendant's solidary obligor, Richardson, and plaintiff's impairment of all possible collateral which might have otherwise been available to defendant.
3. Plaintiff unquestionably released Richardson of any liability on the note. The chronology of key developments in the case provides a clue to plaintiff's overall plan. In July 1987, he entered into an agreement to purchase Richardson's stock. Although he did not sign this agreement he surely agreed to the transaction based upon his actions. He took possession of the stock certificate and through his attorney's letter of August 1987 he reaffirmed Richardson's release from liability on the note. Later in that month he sold all of the corporation's assets and did not bother with the formalities required for such a transaction by R.S. 12:121. He acted as though he was the sole owner of all the stock because he considered himself such. Having taken care of these matters plaintiff filed the present suit only against defendant. He didn't sue Richardson because he had in fact and law released him.
Plaintiff's discharge of Richardson resulted in defendant's release at least for his share of the debt. C.C.Arts. 1792, 3056; R.S. 10:3-606(1)(a). But, plaintiff's orchestration of the sale of the corporate assets deprived him of any remaining hope of successfully suing defendant. The corporation's tax returns for the years preceding the sale show that it was experiencing huge losses on the magazine. To use plaintiff's term the corporation was "hemorrhaging". The purchaser received the magazine and virtually everything else the corporation owned and the corporation received $1,200. Plaintiff received $70,000 ostensibly to prevent him from competing with the purchaser. Had plaintiff filed suit prior to the sale the defendant at least had the hope of recouping something from the corporation, maybe $70,000, maybe more. But, plaintiff deprived defendant of any hope of recovering anything from the corporation before he sued plaintiff as the lone remaining guarantor of the corporation's debt to him. This resulted in a discharge of defendant from liability on the note. C.C.art. 3061. Repealed effective January 1, 1988. R.S. 10:3-606(1)(b).